Of Counsel:
DAVIS LEVIN LIVINGSTON

MARK S. DAVIS                1442-0
MICHAEL K. LIVINGSTON   4161-0
LORETTA A. SHEEHAN      4160-0
851 Fort Street, Suite 400
Honolulu, Hawai`i  96813
Telephone:  (808) 524-7500
Fax:  (808) 356-0418
Email:  lsheehan@davislevin.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| ANNA LOBISCH, Individually, and as Personal Representative for the ESTATE OF ABIGAIL LOBISCH, A Minor, Deceased, and as Next Friend of ZACHARIAH LOBISCH, A Minor; and JAMES LOBISCH, Individually,<br><br>          Plaintiffs,<br><br>     vs.<br><br>UNITED STATES OF AMERICA; ISLAND PALM COMMUNITIES, LLC, a Foreign Limited Liability Company, and DOE DEFENDANTS 1-10,<br><br>          Defendants. | CIVIL NO.  20-00370-HG-KJM<br>(Federal Tort Claims Act)<br><br>**FIRST AMENDED COMPLAINT; DEMAND FOR JURY TRIAL; SUMMONS TO ANSWER CIVIL COMPLAINT** |

1

## FIRST AMENDED COMPLAINT

COME NOW Plaintiffs ANNA LOBISCH, Individually, and as Personal Representative for the ESTATE OF ABIGAIL LOBISCH, A Minor, Deceased, and as Next Friend of ZACHARIAH LOBISCH, A Minor; and JAMES LOBISCH, Individually, by and through their attorneys, DAVIS LEVIN LIVINGSTON, and hereby make the following allegations as causes for action against the above-named Defendants.

## INTRODUCTION

1.   This is a lawsuit against Defendants UNITED STATES OF AMERICA; ISLAND PALM COMMUNITIES, LLC, a Foreign Limited Liability Company, and DOE DEFENDANTS 1-10 (collectively, "Defendants").

2.   For over one year before the death of 7-month old ABIGAIL LOBISCH, which occurred on or about February 24, 2019, active duty military and federal employees, acting within the course and scope of their employment, were aware of an illegal commercial childcare business being run out of military housing located on the Aliamanu Military Reservation in Honolulu, Hawaii by Ms. "Dixie" Denise Villa (Ms. Villa).  The active duty military and federal employees were also aware that Ms. Villa's illegal childcare facility was exposing numerous children to dangerous conditions and blatant neglect.

3.    For over one year before the death of 7-month old ABIGAIL LOBISCH, which occurred on or about February 24, 2019, ISLAND PALM COMMUNITIES, LLC, which is a property management company responsible to oversee the use and maintenance of homes located on Aliamanu Military Reservation, was aware of an illegal commercial childcare business being run out of military housing located on the Aliamanu Military Reservation in Honolulu, Hawaii by Ms. Villa.  ISLAND PALM COMMUNITIES, LLC was also aware that Ms. Villa's illegal childcare facility was exposing numerous children to dangerous conditions and blatant neglect.

4.    Employees of the UNITED STATES OF AMERICA and ISLAND PALM COMMUNITIES, LLC failed to:

- investigate fully Ms. Villa's illegal and dangerous commercial venture;

- revoke or refuse to renew the lease at 4675 Ke Street;

- remove Ms. Villa and her family from on-base housing;

- bar Chief Petty officer Villa and his family from base;

- require Ms. Villa to undergo training required of all Family Child Care providers;

- shut down Ms. Villa's illegal and dangerous commercial venture;

3

- warn the parents of children utilizing Ms. Villa's illegal and dangerous commercial venture of reports of child endangerment and neglect occurring at Ms. Villa's commercial childcare facility, and

- contact Child Protective Services of the State of Hawaii.

The failure of the UNITED STATES OF AMERICA and ISLAND PALM COMMUNITIES, LLC to exercise reasonable care to protect children who were and who would be exposed to an unreasonable risk of harm proximately caused the death of ABIGAIL LOBISCH.

5. This Complaint is filed pursuant to the provisions of the Federal Tort Claims Act against the United States of America for injuries and damages sustained by ABIGAIL LOBISCH resulting in her death on February 24, 2019, and for injuries and damages sustained by her parents, Anna Lobisch and James Lobisch, as well ABIGAIL LOBISCH's sibling, ZACHARIAH LOBISCH.

## JURISDICTION AND VENUE

6. Defendant UNITED STATES OF AMERICA is sued under the Federal Tort Claims Act, Title 28 U.S.C. §§ 1346(b), 2671, *et. seq.*, based on the negligent acts and omissions of its employees, as set forth in this Complaint.

7.      Defendant ISLAND PALM COMMUNITIES, LLC is sued for claims that are part of the same case or controversy as the claims brought against the UNITED STATES OF AMERICA under 28 U.S.C. § 1367.

8.      This Court has subject matter jurisdiction over the claims set forth in this Complaint pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, *et seq*. ("FTCA") and 28 U.S.C. § 1367.

9.      Plaintiffs were citizens of the State of Hawaii at the time of the Defendants' negligence.  The injuries suffered by the Plaintiffs occurred in the City and County of Honolulu, State of Hawaii.  Venue is appropriate in the District Court for the District of Hawai`i pursuant to 28 U.S.C. § 1402.  The acts and omissions giving rise to this cause of action occurred in the County of Honolulu, State of Hawai`i.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10.      Pursuant to the provisions of the Federal Tort Claims Act, 28 USC §2671, *et seq*., Plaintiffs filed an FTCA Claim for Damage, Injury or Death to the Department of the Army on February 3, 2020, within the statutory period as required by law.

11.      Since acknowledgement of receipt of Plaintiffs' filed claims on February 24, 2020, the United States of America has failed to take final administrative action consisting of either a denial or final settlement.  Therefore,

pursuant to the provisions of the Federal Tort Claims Act, 28 USC §2671, *et seq.*, this suit is timely filed after expiration of the six-month statutory period allowed for the administrative review of Plaintiffs' claims.

12.     All administrative procedures have been exhausted and the Complaint is timely filed.

## THE PARTIES

13.     Plaintiff, ANNA LOBISCH is the mother of ABIGAIL LOBISCH, a minor, Deceased, and the mother of ZACHARIAH LOBISCH, a minor.  ANNA LOBISCH brings this suit both Individually and as the Personal Representative for the Estate of ABIGAIL LOBISCH, a minor, Deceased, and as Next Friend of ZACHARIAH LOBISCH, a minor.   At all relevant times, Plaintiff ANNA LOBISCH was a resident of Honolulu, Hawai`i.

14.     Plaintiff, JAMES LOBISCH is the father of ABIGAIL LOBISCH, a minor, Deceased and the father of ZACHARIAH LOBISCH, a minor.  Plaintiff JAMES LOBISCH brings this suit in his individual capacity.  At all relevant times, Plaintiff JAMES LOBISCH was a resident of Honolulu, Hawai`i.

15.     Plaintiff, ABIGAIL LOBISCH, is the minor, Deceased daughter of Plaintiffs ANNA LOBISCH and JAMES LOBISCH.   At all relevant times, Plaintiff, ABIGAIL LOBISCH, a minor, Deceased, was a resident of Honolulu, Hawai`i.

16.     Plaintiff, ZACHARIAH LOBISCH, is the minor, son of Plaintiffs ANNA LOBISCH and JAMES LOBISCH.   At all relevant times, Plaintiff, ZACHARIAH LOBISCH, a minor, was a resident of Honolulu, Hawai`i.

17.     Defendant UNITED STATES OF AMERICA ("USA"), is a body politic, being sued pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, *et seq.*  At all relevant times, the USA was comprised of active duty military and federal government employees acting within the scope of their employment who were aware of Ms. Villa's illegal childcare facility, located on federal land or in a federally operated (or contracted) facility, to wit, Aliamanu Military Reservation ("AMR").  At all relevant times, the USA was aware that Ms. Villa's illegal childcare facility created an unreasonable risk of bodily harm to all children who stayed there.  Defendant USA knew or had reason to know of the necessity and opportunity to halt the illegal child care business, and to warn parents of the unreasonable risk of harm posed by the illegal child care business, but failed to take reasonable steps to protect the children who stayed there.  Defendant USA is vicariously liable for the negligence of its employees under the doctrine of *respondeat superior.*

18.     At all relevant times, Defendant Island Palm Communities, LLC ("IPC"),  was a Foreign Limited Liability Company, duly licensed to do business in the State of Hawai`i, with its principal place of business and/or headquarters in

Honolulu, located at 215 Duck Road, Building 250, Schofield Barracks, Hawai`i 96857.

19.    At all relevant times, Defendant IPC was the property manager of the house located on AMR from which Ms. Villa ran her illegal commercial child care business.  Defendant IPC was comprised of persons acting within the course and scope of their employment who were aware of Ms. Villa's illegal child care facility, and aware that Ms. Villa's illegal child care facility created an unreasonable risk of bodily harm to all children who stayed there.  Defendant IPC knew or had reason to know of the necessity and opportunity to halt the illegal child care business, and to warn parents of the unreasonable risk of harm posed by the illegal child care business, but failed to take reasonable steps to protect those children who stayed there.

20.    DOE DEFENDANTS 1-10 included herein under fictitious names for the reasons that the true names and identities are presently unknown to Plaintiffs. DOE DEFENDANTS are connected in some manner with the Defendants' named herein and/or were actual and/or apparent agents, employees, officers, directors, representatives, licensors or professional corporations of Defendants named herein and were in some manner presently unknown to Plaintiffs, who engaged in the activities alleged herein in some manner and in some degree responsible for the injuries and damage to Plaintiffs alleged herein and loss of the life of ABIGAIL

LOBISCH a minor, Deceased.  Plaintiffs hereby pray for leave to certify their true names, identities, capacities, activities and/or responsibilities when the same are ascertained.

## FACTS COMMON TO ALL CLAIMS

21.    In 2015, Ms. Villa, her husband Chief Petty Officer Aaron Villa ("Chief Petty Officer Villa"), and their children resided in housing provided by the USA within Naval Air Station Whidbey Island, in a neighborhood known as Maylor Point.

22.    A person who resided in Maylor Point, "B.S." realized that Ms. Villa was operating a child care center from her residence in violation of Department of Defense regulations and reported the unauthorized activity to Child, Youth & School Services (CYSS), Family Child Care (FCC) Office at NAS Whidbey Island.

23.    The FCC Office was tasked with providing administrative oversight for the installation's FCC providers, i.e. trained and certified child care professionals approved to provide child care in their homes.

24.    B.S. also reported Ms. Villa's unauthorized child care facility to the Chain of Command of Chief Petty Officer Villa.

25.    In 2015, an officer above Chief Petty Officer Villa in his Chain of Command, upon learning of the unauthorized child care facility being run by Ms.

Villa from her home, instructed Chief Petty Officer Villa to "shut it down."

26.     In 2017, the USA stationed Chief Petty Officer Villa at Joint Base Pearl Harbor Hickam and moved Chief Petty Officer Villa, Ms. Villa, and their children to Honolulu, Hawaii.

27.     Despite having knowledge of complaints regarding Ms. Villa's operation of an unauthorized child care center at Maylor Point, the USA provided Chief Petty Officer Villa, Ms. Villa, and their children with housing within the Aliamanu Military Reservation (AMR), located at 4675 Ke Street, Honolulu, Hawaii.

28.     Chief Petty Officer Villa and/or Ms. Villa signed a lease with Defendant IPC, the entity that served as the property manager for the U.S. Army Installation Management Command at AMR, for a residence located at 4675 Ke Street, Honolulu, Hawaii.

29.     The Villas' lease instructed that residents who desire to provide child care services in their private residence may do so only under the direction of Child and Youth Services, Certified Family and Child Care Program, and subject to U.S. Army Regulation 608-10.

30.     Defendant IPC retained the authority to enforce the lease entered with Chief Petty Officer Villa and Ms. Villa.

31.    In early December, 2017, a whistleblower and neighbor of Ms. Villa, (hereinafter referred to as "K.C."), notified Defendant IPC, the entity that served as the property manager for the U.S. Army Installation Management Command at AMR, that Ms. Villa was operating an illegal child care facility from Ms. Villa's residence, in violation of U.S. Army regulations.   The representative of IPC informed K.C. that it did not handle such calls, and that she needed to call the FCC office at Garrison Command.

32.    On December 18, 2017, K.C. telephoned the (CYSS), (FCC) Office at Garrison Command and spoke with Marjorie Williams, a person designated as a mandated reporters pursuant to 34 U.S.C. § 20341.   K.C. asked whether the child care facility at 4675 Ke Street was a registered and approved child care facility on base.   Ms. Williams acknowledged that it was not.

33.    K.C. informed Ms. Williams that the child care facility at 4675 Ke Street was not providing safe care for children.   K.C. reported seeing multiple children crying and screaming, without adult supervision, in the backyard of the facility, and of one occasion when a little boy, crying because his head was stuck in a play structure, had been essentially abandoned until other little children were able to free him.   K.C. stated to Ms. Williams that the adult to child ratios could not be safe.   Ms. Williams stated that she would forward this information to her supervisor, Angela Austin, another person designated as a mandated reporter

pursuant to 34 U.S.C. § 20341.  Ms. Williams stated that the FCC would come out to investigate.  Ms. Williams asked K.C. to document the parents and children at drop off and pick up, and to take photos and videos.

34.    After the Christmas holidays, Ms. Villa's illegal child care facility was back in operation, but K.C. noticed that there appeared to be even more children being kept at the facility.  On January 3, 2018, K.C. telephoned the FCC Office and spoke again to Ms. Williams.

35.    Ms. Williams transferred the call to Angela Austin, the Director of the CYSS, FCC program.  K.C. again explained the unsafe conditions she had seen at 4675 Ke Street to Ms. Austin.  Ms. Austin admitted that FCC had not come out to investigate as per FCC policy.  Ms. Austin asked K.C. to continue to document and to call the Military Police if she saw any life-threatening activity or children being left alone, outside, unattended.

36.    The next day K.C. witnessed a child approximately 1 year old in the backyard of the facility, crying and crying.  K.C. recorded the child crying, as requested.  K.C. recorded the child crying for approximately 5 minutes.  At that point another child told the one-year-old, "quiet!"  No one ever came to see what was wrong.

37.    On January 5, 2018, K.C. reported what she had seen to Ms. Williams of FCC.  Ms. Williams admitted that they had not come to investigate the facility

yet.  As K.C. spoke with Ms. Williams, children were outside, in the backyard of the facility.  K.C. walked into her backyard and held the phone up so that Ms. Williams could hear the children screaming and crying.  Ms. Williams acknowledged hearing the children.  Ms. Williams promised to talk with Director Austin about the neglected children at the facility.

38.    On January 8, 2018, K.C. heard a child yelling:  "fire, fire!"  She came to the window and saw a boy of about 4-5 years of age holding a long lighter. The boy was attempting to light a trampoline in the backyard on fire.  K.C. saw a flame come out of the lighter.  Since the FCC Office had been unresponsive, K.C. decided to call the Family Advocacy Center (FAC), which held itself out as a resource for military personnel to provide "trained professionals," available "for crisis response, information on reporting options, medical treatment options, law enforcement's response, emergency services, safety planning, obtaining military and civilian protective orders, and accompaniment to medical forensic exams and medical appointments, as well as accompaniment to court for orders of protection hearings and trials."

39.    K.C. called the FAC Office, but received no response.  K.C. next called the Victim Advocate hotline of the FAC and spoke with a Victim Advocate, a person designated as a mandated reporter pursuant to 34 U.S.C. § 20341.  K.C.

described the conditions that she had witnessed at Ms. Villa's illegal child care facility.

40.    After that phone call, K.C. telephoned Ms. Williams of FCC.  Ms. Williams stated that they could not leave the office and asked K.C. to call the Military Police.   Ms. Williams stated that once the MPs were called, an investigation would commence, and the FCC would be able to come out to inspect the facility.

41.    K.C. telephoned the Military Police at the Fort Shafter Office.  K.C. reported what was occurring at Ms. Villa's illegal child care facility to Military Police Officers, persons designated as mandatory reporters pursuant to 34 U.S.C. § 20341.

42.    During this series of phone calls on January 8, 2018, K.C. kept an eye on the children in the yard of the facility.  She saw the five-year-old who had been trying to light the trampoline on fire hand the lighter to a smaller child.  The smaller child was playing on the bottom of a slide.  The smaller child put the lighter in his mouth.  At that point the Military Police arrived at the facility.

43.    K.C. called Ms. Williams of FCC and let her know that the MPs had arrived.

44.    On January 11, 2018, K.C. witnessed parents dropping off children at the facility.  K.C. called Ms. Williams of FCC and let her know.  K.C. told Ms.

Williams that she had pictures.  Ms. Williams asked K.C. to send the photos to her.

K.C. sent photos to Ms. Williams.  Ms. Williams sent an email back, stating that

she had informed the proper personnel of the current drop off activity at the facility

providing unauthorized care.  Ms. Williams asked K.C. to continue to keep FCC

informed of the activities at the facility. K.C. emailed a copy of the video recording

of neglected children to Ms. Williams and Ms. Austin.  K.C. also emailed Villa's

Facebook advertisements for the facility.

45.    On January 15, 2018, Ms. Austin of FCC emailed K.C., thanked her

for her photos and video, and asked her to contact FCC immediately if she saw any

further activity at the facility.

46.    On February 5, 2018, K.C. telephoned FCC, to report continued drop

offs and pick-ups at the facility.

47.    On February 6, 2018, K.C. telephoned FCC, to report continued drop

offs and pick-ups at the facility.  Ms. Williams or Ms. Austin assured K.C. that

they would be making recommendations to the Garrison Commander.  Either Ms.

Williams or Ms. Austin told K.C. that Ms. Villa had been told to shut it down.  Ms.

Williams or Ms. Austin did not inform K.C. that an official cease and desist order

had been issued.  K.C. asked whether FCC had notified IPC, as the lease with IPC

specifically prohibited unapproved businesses being run from military housing at

AMR.   Either Ms. Austin or Ms. Williams assured K.C. that IPC had been contacted.

48.     In February, 2018, K.C. began to call IPC to inform them of the child care being provided in violation of the terms of the lease at the facility.   On February 6, 2018, K.C. spoke with Kirsti Nation, the Manager of IPC.   She informed Ms. Nation of her observations of the neglect and child endangerment at the facility.  Ms. Nation informed K.C. that the FCC was working the case and that there was nothing that IPC could do about unauthorized child care on base.

49.     On February 7, 2018, K.C. telephoned FCC to inform them of continued drop offs and pick-ups.   She also emailed them pictures from the February 6, 2018 drop off.   At this point, FCC informed K.C. that they had submitted their recommendations up the Chain of Command.

50.     On February 12, 2018, K.C. emailed Ms. Williams and reported that she had seen Ms. Villa walk by with nine (9) children.  Ms. Villa was holding one child, pushing a stroller containing 2 children, and walking beside 2 children who were pulling a wagon containing 3 children.  She emailed a photo of this to FCC.

51.     On February 13, 2018, K.C. emailed Ms. Williams and informed her of the adult to child ratio violation that she had seen the day earlier and of a small trampoline with a hole in it in which children were getting stuck in the backyard of the facility.  She also called Ms. Austin, who asked her to send her photos with a

time-stamp, so that they could be sure of the date on which the photo had been taken.

52.     On February 14, 2018, K.C. emailed the requested time-stamped photos to Ms. Williams and Ms. Austin at FCC.

53.     On February 21, 2018, K.C. called FCC to ensure that they had received the photos and to be sure that they constituted sufficient evidence.  FCC assured her that the photos were good.

54.     On February 21, 2018, Ms. Villa came to the residence of K.C., accusing K.C. of reporting her to IPC.  This confrontation made K.C. feel fear and apprehension.

55.     On February 22, 2018, K.C. emailed Ms. Nation at IPC to ask if IPC had revealed her identity.  Ms. Nation assured her that she hadn't.  K.C. called FCC and asked if they had revealed her identity.  FCC assured her that they hadn't.

56.     On March 12, 2018, K.C. sent FCC an email, reporting continued drop offs and pick-ups.  K.C. noticed that Ms. Villa sometimes left the facility after children had been dropped off.  K.C. provided information to FCC that Ms. Villa apparently was leaving children with a teenage foreign exchange student.

57.     On March 21, 2018, K.C. sent another email to FCC, reporting that Ms. Villa continued to run her illegal child care business, and that it appeared that

the child population had increased at the facility.  K.C. sent photos, as requested by FCC.

58.     On March 22, 2018, K.C. notified FCC about four children being left alone outside and unsupervised at the facility.  Ms. Williams asked whether K.C. wanted to call the MPs or whether FCC should.  K.C. told Ms. Williams that it probably would be better if FCC did.  Several minutes later, the MPs arrived.  K.C. observed Ms. Villa angrily talking with the MP and pointing at K.C.'s home.  The MP left.  Ms. Villa came to the backyard and let out a long scream.  Then she put a radio in the backyard and played music loudly for about an hour.  Ms. Villa entered a post on Facebook, asking how to deal with "an awful neighbor."  Ms. Villa's Facebook post contained veiled threats—words to the effect of "wait until Aaron gets back, wait until my outspoken daughter arrives."

59.     Fearing for her safety, K.C. called the FCC.  At this point, K.C. asked the FCC about Talia's Law, and their duty to report child abuse and neglect.  Ms. Austin suggested that K.C. speak with the U.S. Army Military Police investigators who were investigating Ms. Villa.  K.C. called the U.S. Army Military Police Investigator.  The U.S. Army Military Police Investigator assured K.C. that he was working on the case, but that he needed her to come forward to have a case against Ms. Villa.  K.C. reluctantly agreed, as she was afraid of Ms. Villa.

60.    On March 27, 2018, K.C. provided a sworn statement to MP investigators.  She was assured that now that a live person was willing to give testimony, a strong case could be made against Ms. Villa and her operation of the facility.  The MPs asked that K.C. share all of the photos and videos provided to FCC be provided to them.  K.C. left the MPs feeling that something would finally happen.

61.    Given her willingness to provide written testimony, the assurances from the FCC and the MP investigators, K.C. decided that the USA would enforce the Department of Defense regulations regarding unauthorized child care.  Because she believed that the USA would take action, K.C. decided to continue to cooperate with military authorities.

62.    On April 13, 2018, K.C. telephoned FCC and told them that she was still seeing drop offs and pick-ups.  She told them that Ms. Villa was still openly advertising on Facebook, and offering overnight stays (6:00 pm to 6:00 am extended hours as needed).  K.C. sent FCC a screen shot of Ms. Villa's Facebook ad.

63.    On April 21, 2018, K.C. sent Ms. Williams and Ms. Austin her last email.  She told them that there were still drop offs and sent them a screen shot of Ms. Villa's Facebook ad.

64.     Starting in February 2019, K.C. noticed more children being dropped off.  She saw more children being left alone and unsupervised in the backyard of the facility.

65.     On February 20, 2019, K.C. submitted a complaint to the U.S. Army Garrison—Hawaii regarding the facility.  She wrote:

> Last year, a person running an unlicensed daycare at a home on AMR was reported to FCC officials and later on to the MPs. On January 8, 2018 MPs, the Honolulu Police Department, Family Advocacy and FCC officials made contact and entry into the home and found an overwhelming amount of children there, including one toddler and several other children in the back yard, without any adult supervision, playing with a working long-reach lighter.
>
> In the weeks and months that followed, MPs and investigators would respond two separate times. On all occasions, they deemed there were violations being made and shut it down. Three times, the MPs sat at the home and waited as each parent was called to come and get their children. Police reports were made from witnesses, Facebook childcare adds were recorded, and pictures and videos of children left out to cry, neglected, and not receiving proper care were recorded.
>
> If none of that was enough to make this stop, at once, then perhaps being found to be in violation of the community lease three times should have done it. But, it didn't. Although the drop-off of children tapered off for a couple of months, it did not stop completely and the MPs and FCC officials were notified of that. It is unknown to me if there has been further follow-up by any investigators. What is known is that, there is a renewed flow of unsuspecting parents dropping children off at this unlicensed home again.
>
> This isn't a simple case of an unlicensed mom trying to help out parents who desperately need the child care. Instead, this is a case of child welfare. Childcare Hawaii state laws, and FCC regulations, are in place for the sole purpose of keeping the children and providers in private homes safe. The children who are being dropped off here are

not afforded that protection. Instead, they are left in a situation that has already been found to be inappropriate and in violation three times in the past.

What will it take?

Authorities and those tasked with keeping us safe always tell us: If you see something, say something. However, this mantra is only effective when those who are repeatedly in violation of laws and regulations are stopped.

I am submitting this ICE comment card to report the continued unlicensed childcare activities at 4675 Ke St.

66.     On February 21, 2019, MPs went to the facility and spoke with Ms. Villa. They left without removing children or ceasing the illegal FCC.

67.     On February 23, 2019, Ms. Villa took custody of ABIGAIL LOBISCH and ZACHARIAH LOBISCH for overnight child care in her illegal child care facility located at 4675 Ke Street on AMR.

68.     Upon information and belief, Ms. Villa stated to the Honolulu Police Department that as of February 23-24, 2019, she had been the sole caregiver of four (4) children at the facility, to include ABIGAIL LOBISCH.  Ms. Villa admitted to feeding ABIGAIL LOBISCH at approximately 10:00 pm on February 23, 2019, and to finding ABIGAIL LOBISCH cold and nonresponsive on the morning of February 24, 2019.

69.     Upon information and belief, on or about February 23-24, 2019, Ms. Villa administered a lethal dose of diphenhydramine to baby ABIGAIL LOBISCH

21

in order to make baby ABIGAIL LOBISCH lose consciousness.

70.    On February 24, 2019, A.L, the 7-month old daughter of Anna Lobisch and James Lobisch was pronounced dead at the illegal child care facility operated from the illegal child care facility run by Ms. Villa.  ABIGAIL LOBISCH death was due to poisoning with lethal levels of diphenhydramine.

71.    On February 24, 2019, the day that A.E.L.'s lifeless body was found at Villa's illegal child care facility, the Defendant USA finally closed the illegal child care facility.

72.    On July 20, 2019, the City and County charged Ms. Villa via Complaint with Manslaughter, a violation of 707-702(1)(a), Hawaii Revised Statutes.

73.    On February 25, 2019, Colonel Thomas Barrett admitted in a town hall meeting for AMR residents that that the U.S. Army had issued two (2) "cease and desist" orders in the early months of 2018, but that Ms. Villa had disregarded those orders.

74.    As the military sponsor, Chief Petty Officer Villa was responsible for his conduct and the conduct of his family.

75.    At all relevant times, the USA had the authority and ability to terminate quarters, i.e. military housing provided to Chief Petty Officer Villa and his family.

76.    At all relevant times, the USA did not terminate military housing provided to Chief Petty Officer Villa and his family, to include Ms. Villa.

77.    At all relevant times, the USA had the authority and ability to bar from post Chief Petty Officer Villa and his family.

78.    At all relevant times, the USA did not bar from post Chief Petty Officer Villa and his family.

79.    At all relevant times, the USA had the authority and ability to bring charges against Chief Petty Officer Villa under Article 92, the Uniform Code of Military Justice (Failure to Obey and Order or Regulation) for the continued use of his home as an unauthorized child care center.

80.    At all relevant times, the USA did not bring charges against Chief Petty Officer Villa under Article 92, the Uniform Code of Military Justice.

81.    At all relevant times, the USA had the authority and ability to refuse to offer Chief Petty Officer Villa leased housing at the AMR.

82.    At all relevant times, the USA did not refuse to offer Chief Petty Officer Villa and his family, leased housing at the AMR.

83.    At all relevant times, IPC had the authority and ability to refuse to re-new the lease of Chief Petty Officer Villa's home at 4675 Ke Street, AMR due to the operation of an unauthorized child care center.

84.     At all relevant times, IPC did not refuse to re-new the lease of Chief Petty Officer Villa's home at 4675 Ke Street, AMR.

### FIRST CLAIM FOR RELIEF
### NEGLIGENCE AND WRONGFUL DEATH

85.     The allegations that are set forth above are above are incorporated by reference herein.

86.     At all times, Defendants the USA and IPC each had a duty to exercise reasonable care to prevent Ms. Villa from conducting her illegal child care business in military housing at the Aliamanu Military Reservation in that the USA, as a possessor of land, knew or should have known that Ms. Villa's illegal child care business created an unreasonable risk of bodily harm to all children who stayed there, and knew or had reason to know of the necessity and opportunity to halt the illegal child care business.

87.     At all times, Defendants the USA and IPC each had a duty to exercise reasonable care to protect the children who were attending Ms. Villa's illegal child care business in that the USA and IPC knew or should have known that its conduct of providing free housing at 4675 Ke Street, Honolulu Hawaii had created an unreasonable risk of causing harm to children.

88.     At all times, Defendants the USA and IPC knew or should have known that Ms. Villa's illegal child care business was exposing children to

unreasonable risks, and thus had a duty to notify Child Protective Services, but failed to do so.

89.   At all times, Defendant the USA repeatedly assured whistleblowers who disclosed the dangerous conditions at Ms. Villa's illegal child care business that the USA would take reasonable care to protect the children who attended Ms. Villa's illegal child care business, and caused such whistleblowers to rely on the assurances of the USA that children would be protected, and not to contact Child Protective Services.

90.   At all relevant times, Defendants the USA and IPC had a special relationship to all children who received child care at Ms. Villa's illegal child care facility, and thus had a duty to investigate K.C.'s reports of child neglect occurring at the illegal child care facility located at 4675 Ke Street, but failed to do so, thus permitting Ms. Villa's unlawful behavior to continue.

91.   At all relevant times, Defendants the USA and IPC had a special relationship to all children who received child care at Ms. Villa's illegal child care facility, and thus had a duty to warn the parents and guardians of such children of the unsafe conditions and neglect that was occurring at the illegal child care facility.

92.   At all relevant times, Defendants the USA and IPC each failed in its individual duties to exercise reasonable care to prevent Ms. Villa from conducting

her illegal child care business and/or to use reasonable care to protect the children who were being exposed to unreasonable risks of harm, thus proximately causing the death of ABIGAIL LOBISCH on or about February 23-24, 2019.

93.   For the reasons set forth herein, the Defendants the USA and IPC, through its individual acts or through the acts of others for which it is responsible and/or vicariously liable, owed a duty of due care to Plaintiffs which it negligently breached.   Said negligence was a substantial factor and a proximate cause of ABIGAIL LOBISCH's death, including but not limited to physical and emotional distress, physical pain and suffering, loss of life, and all other damages to which Plaintiffs are entitled under Hawai`i law.

## SECOND CLAIM FOR RELIEF
## NEGLIGENCE PER SE OF THE DEFENDANT

94.   The allegations set forth above are incorporated by reference herein.

95.   Defendant the USA is bound by 34 U.S.C. § 20341, the October 7, 2003 Memorandum of Agreement between Military Services in Hawai`i and State of Hawai`i, Department of Human Services, Child Welfare Services Branch as well as H.R.S. Chapter 350, Child Abuse § 350-1 *et. seq.;* Chapter 587, Child Protective Act § 587-1 *et. seq.;* and Army Regulations 608-10 and 608-18, The Army Family Advocacy Program.

96.   At all relevant times, Defendant the USA was under an obligation to report all known and suspected cases of child abuse, notify the appropriate

authorities, investigate reports of abuse and assess, treat and protect the victims of child abuse.

97.   The Defendant USA violated 34 U.S.C. § 20341, the October 7, 2003 Memorandum of Agreement between Military Services in Hawai`i and State of Hawai`i, Department of Human Services, Child Welfare Services Branch as well as H.R.S. Chapter 350, Child Abuse § 350-1 *et. seq.;* Chapter 587, Child Protective Act § 587-1 *et. seq.;* and Army Regulations 608-10 and 608-18, The Army Family Advocacy Program, when its agents and employees failed to report, notify, investigate, assess, treat and protect the children who were being abused and neglected at Ms. Villa's illegal child care business.

98.   Plaintiff ABIGAIL LOBISCH was a member of the class of persons for whom the above-referenced statutory and regulatory protections were enacted, and her death resulted from not preventing child abuse that the statutes and regulations were enacted to prevent.

99.   The violation of 34 U.S.C. § 20341, the October 7, 2003 Memorandum of Agreement between Military Services in Hawai`i and State of Hawai`i, Department of Human Services, Child Welfare Services Branch as well as H.R.S. Chapter 350, Child Abuse § 350-1 *et. seq.;* Chapter 587, Child Protective Act § 587-1 *et. seq.;* and Army Regulations 608-10 and 608-18, The Army Family Advocacy Program by the Defendant constitutes negligence *per se*, and was a

substantial factor in causing ABIGAIL LOBISCH's death, including but not limited to loss of enjoyment of life, loss of consortium, economic loss, and all other special and general damages to be shown at trial.

## THIRD CLAIM FOR RELIEF
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

100.   The allegations that are set forth above are above are incorporated by reference herein.

101.   All Plaintiffs suffered severe and devastating emotional distress as a result of ABIGAIL LOBISCH's wrongful death, which were proximately caused by the negligent acts and omissions of Defendants. Plaintiffs are entitled to compensation for emotional distress in amounts to be shown at trial.

## FOURTH CLAIM FOR RELIEF
## LOSS OF SOCIETY, COMPANIONSHIP, COMFORT, CONSORTIUM, PROTECTION, FILIAL CARE AND ATTENTION

102.   The allegations that are set forth above are incorporated by reference herein.

103.   Plaintiffs ANNA LOBISCH and JAMES LOBISCH are the natural parents of ABIGAIL LOBISCH and ZACHARIAH LOBISCH.  ZACHARIAH LOBISCH is the natural sibling of ABIGAIL LOBISCH.  As a result of the negligence of Defendants, which proximately caused ABIGAIL LOBISCH's wrongful death, Plaintiffs ANNA LOBISCH and JAMES LOBISCH suffered a devastating and permanent loss of society, companionship, comfort, consortium,

protection, filial care and attention. Plaintiffs ANNA LOBISCH, JAMES LOBISCH, and ZACHARIAH LOBISCH are entitled to compensation for loss of society, companionship, comfort, consortium, protection, filial care and attention arising out of the death of ABIGAIL LOBISCH, in amounts to be shown at trial.

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and against Defendants UNITED STATES OF AMERICA and ISLAND PALM COMMUNITIES, LLC and that Plaintiffs be awarded special and general damages in amounts to be proven at trial, and that this Court award such additional relief as it deems just and appropriate.

DATED:   Honolulu, Hawai'i, September 1, 2020.

_/S/ LORETTA A. SHEEHAN_____
MARK S. DAVIS
MICHAEL K. LIVINGSTON
LORETTA A. SHEEHAN
Attorneys for Plaintiffs